FILED IN CHAMBERS
U.S.D.C ATLANTA

Date: Aug 25 2023

KEVIN P. WEIMER , Clerk

By: s/Kari Butler

Deputy Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ROME DIVISION

UNITED STATES OF AMERICA,

v.

BRYAN WHITE,

Defendant.

CRIMINAL ACTION FILE

NO. 4:22-CR-00017-WMR-WEJ-5

## NON-FINAL REPORT AND RECOMMENDATION

This matter is before the Court on the following Motions filed by defendant, Bryan White:  (1) Motion to Suppress Statements [189]; (2) Motion to Suppress Pole Camera Surveillance [191]; and (3) Motion to Suppress Evidence Seized from any Warrantless Search of Defendant's Residence or other Property, Including Cell Phone [196].  The Court conducted an evidentiary hearing [210] regarding these Motions on May 25, 2023, which has been transcribed ("Tr.") [216].  Based on the

evidence produced at the hearing and the briefs of counsel, the undersigned **RECOMMENDS** that defendant's Motions be **DENIED**.[1]

## I.    STATEMENT OF FACTS

### A.    Defendant's Arrest, Interview, and Seizure of his Cell Phone

The sole witness for the Government was Jeremy Gazerro, a Deputy Sheriff with the Bartow County Sheriff's Office ("BCSO"), who also serves as a task force officer with the Federal Bureau of Investigation ("FBI").  (Tr. 3-4.)  In his capacity as a task force officer, Agent Gazerro participated in an investigation into a drug-trafficking organization operated by Frank Miller and Wilfort Foster (both of whom are defendants in this matter).  (Id. at 4.)  As part of that investigation, agents obtained a series of federal wiretaps on Mr. Miller's cell phone.  (Id. at 5.)  Those wiretaps led to the identification of defendant White.  (Id. at 5-6.)[2]  Agent Gazerro identified Mr. White as a "tester" of heroin and fentanyl and a distributor for Mr. Miller.  (Id. at 6.)

——————————————

[1] A Non-Final Report and Recommendation issued concurrently herewith addresses defendant's Motion to Suppress Wiretap Evidence [197].

[2] A "tester" is someone who uses a drug and informs the distributor about its quality.  (Tr. 7, 35.)

The aforementioned investigation eventually led to the instant Indictment [15] of Mr. Foster and seven others, including Mr. White.  (Tr. 6.)  With the return of that Indictment, officers obtained a federal arrest warrant for Mr. White, which they executed on May 26, 2022, at his residence located at 4951 Lake Park Lane, in Acworth, Georgia.  (Id. at 6-7.)

Early on the morning of May 26, Agent Gazerro conducted a briefing for members of the Bartow-Cartersville Drug Task Force and the BCSO's Special Operations Unit, and explained that they were executing an arrest warrant for Mr. White and did not have a search warrant.  (Id. at 7, 27, 38.)  Agent Gazerro's plan was for the officers to locate and arrest Mr. White, conduct a sweep of the residence for officer safety, and then turn Mr. White over to him for an interview.  (Id. at 7.)

An entry team of six or seven officers with firearms drawn knocked on the door of Mr. White's residence between 7:00 and 7:15 a.m., and were allowed in by either the defendant or his wife.  (Tr. 7, 22, 25, 37.)  They immediately placed Mr. White under arrest, and removed him, along with his wife and two small children, from the home.  (Id. at 8, 25-26.)  Officers then conducted a sweep of the residence and encountered no one else; at this point all officers exited the residence.  (Id.)  After the residence was secured, the officers holstered their weapons.  (Id. at 9.)

3

There were approximately 15-20 armed law enforcement officers at the scene, some of whom were carrying rifles and most of whom were wearing tactical gear. (Id. at 22-23.)[3]  There were also five or six law enforcement vehicles (some marked and some unmarked) and one unmarked van on the scene.  (Id. at 23-24.)

Agent Gazerro was not part of the initial entry team, but met Mr. White for the first time outside of his residence. (Tr. 7-8, 22.)  The defendant was cuffed with his hands behind his back and was wearing shorts with no shirt.  (Id. at 8, 29, 37.) The Agent was wearing street clothes and had a holstered firearm.  (Id. at 9.) According to Agent Gazerro, the defendant did not appear to be under the influence of narcotics, he was not confused about where he was or why officers were at his home, and he could be understood.  (Id. at 10.)[4]  He also did not appear to be under the influence of alcohol, and Agent Gazerro could not smell alcohol on him.  (Id. at 10-11.)

---

[3] The officers who did not enter the residence waited around the perimeter of the residence.  (Tr. 25.)

[4] Officer Gazerro knew that Mr. White was a fentanyl and heroin addict, and recognized the possibility that he could have used drugs before this custodial interview.  (Tr. 34-36.)

4

Agent Gazerro told Mr. White that he needed to speak with him, and asked if he would rather speak and be read his rights outside or if he would be more comfortable inside.  (Tr. 8.)   The defendant replied that he would be more comfortable inside.  (Id.)  Therefore, Agent Gazerro and two others (Agent Sinyard and Intelligence Analyst Denise Rodriguez) escorted the defendant back into his residence.  (Id. at 8-9.)  Mr. White was outside of his home for about five minutes.  (Id. at 28.)

Mr. White sat on his living room couch and was orally informed of his Miranda rights, a process that was recorded using a cell phone.  (Tr. 9, 11-12, 29-30; see also Gov't Ex. 1 (DVD of interview).)  The defendant agreed to speak to Agent Gazerro.  (Id. at 12.)  He also signed an "Advice of Rights" form that listed his Miranda rights.  (Id. at 13; see also Gov't Ex. 2 [211-1], at 1 (copy of form).)[5] Mr. White did not express confusion about his rights.  (Id. at 13.)  At no point was a weapon pointed at the defendant; at no point was Mr. White threatened; at no

---

[5] An officer entered the residence and moved the defendant's handcuffs from the rear to the front so that he could sign the form.  (Tr. 12.)  He remained cuffed throughout the interview.  (Id. at 38.)

5

point did anyone put their hands on the defendant (other than to escort him); at no point did someone yell at the defendant; and he had no visible injuries.  (Tr. 10, 12.)

Agent Gazerro interviewed the defendant for about 27 minutes.  (Tr. 13.)[6] During this interview, Mr. White did not appear confused or under the influence of any substance.  (Id. at 13-14.)  He also did not state that he was "high."  (Id. at 14.) When Agent Gazerro asked the defendant a question, he provided a logical response.  (Id.)  During the interview, no one threatened the defendant or made any promises to him.  (Id.)  Although Mr. White made some admissions during the interview (such as his purchase of drugs from Mr. Miller and his own drug use), he also chose not to talk about certain things.  (Id. at 14-15, 38.)  He also expressed

_____

[6] In the video, Mr. White immediately admits that he is a drug addict.  At approximately six minutes into the video, the female officer, Ms. Rodriguez, asks Mr. White if Mr. Miller provides him drugs.  When Mr. White does not respond, she tells him, "This is for you.  Miller has his own problems.  Now it's yours.  You have to talk.  That's why we are here."  (Def.'s Br. [217], at 3-4, quoting Gov't Ex. 1 at 6:00.)  Mr. White then asks if he is going to jail.  Agent Gazerro tells him that he is getting indicted, but that cooperation can help him.  He tells the defendant that he does have a warrant and he does have to go to jail.  Mr. White says he does not want to hurt himself by answering questions.  (Id., citing Gov't Ex. 1 at 7:00.)

fear about Mr. Miller and some of his associates.  (Id. at 15.)  Based on all of this, Agent Gazerro believed that the defendant understood what was happening.  (Id.)  The defendant never stated that he no longer wanted to talk.  (Id. at 13.)  However, Officer Gazerro eventually stopped asking questions and turned off the cell phone camera because it sounded like Mr. White did not want to talk anymore.  (Id. at 31.)

After recording ceased and after Agent Gazerro believed the Mirandized interview to be over, the Agent asked Mr. White if he had a cell phone; the defendant identified a cell phone lying in plain view on the coffee table in front of him as his.  (Tr. 15-16, 30, 31-32.)  Agent Gazerro asked for the passcode to the cell phone, but the defendant refused to provide it.  (Id. at 16, 31-32.)

Agent Gazerro then seized Mr. White's cell phone from the coffee table as evidence.  (Tr. 32.)  Agent Gazerro testified that, given the wiretaps, he believed relevant evidence might be contained on that cellular device.  (Id. at 16, 39.)  Specifically, Mr. Miller had maintained the same cell phone number while the subject of a wiretap.  (Id. at 16.)  Mr. White had been intercepted on the wiretap of Mr. Miller's phone discussing their drug trafficking.  (Id.)  The investigation had also uncovered text messages between Messrs. White and Miller discussing drug

trafficking.   (Id. at 16-17.)[7]   Although the cell phone number that Mr. White provided to Agent Gazerro during collection of his biographical information was not the same one captured on the wiretaps, the Agent elected to seize that cell phone. This is because, while a cell phone's number may change, if it is the same cell phone, data can remain on that cell phone and be backed up.  (Id. at 17.)  Based on his training and experience, Agent Gazerro knew that if a user obtains a new cell phone, he can download data from his prior device onto the new device.  (Id.)

### B.    **The Two Cameras**

Agent Gazerro testified that the FBI used a pole camera in the investigation of this case.  (Tr. 17.)  The FBI installed the pole camera at the cul-de-sac of 5 Quail Court in Cartersville, Georgia, which was Mr. Miller's residence when the investigation began.  (Id. at 17-18, 45.)  This pole camera continuously recorded twenty-four hours a day for two and one-half years and focused on the front of the

---

[7] Agent Gazerro did not complete a report or take any notes about the seizure of the cell phone.  (Tr. 32, 34.)  He also took no photographs of the cell phone when it was seized.  (Id. at 40.)

residence.  (Id. at 17, 20, 44-45.)[8]  This pole camera provided a live feed, had night vision capabilities, could zoom in and out, view left and right, and could be rewound.  (Id. at 19-20, 45.)  Although the pole camera permitted officers to see into the garage (if it were open) at certain angles that might not be visible to officers standing outside the house, it could not peer inside Mr. Miller's home.  (Id. at 20, 45.)  In other words, law enforcement could generally not see anything with the pole camera that could not be seen if one viewed the home from the street.  (Id. at 20.)

Mr. White did not live at 5 Quail Court in Cartersville. (Tr. 18.)  He resided at the address where he was arrested, 4951 Lake Park Lane in Acworth.  (Id.)  To Agent Gazerro's knowledge, Mr. White never went to Mr. Miller's residence at 5 Quail Court in Cartersville.  (Id.)  There is nothing of investigative significance regarding Mr. White connected to Mr. Miller's residence.  (Id. at 18-19.)

_____

[8] During the course of this long-term investigation, Mr. Miller moved to an apartment at 1134 Clarinbridge in Kennesaw, Georgia, and then to a house in Rockmart, Georgia.  (Tr. 19.)  The FBI apparently left the pole camera at 5 Quail Court in Cartersville after Mr. Miller moved.

Homeland Security Investigations ("HSI") also installed a camera in an internal hallway at an apartment complex in Atlantic Station during this investigation.  (Tr. 20-21, 45-46.)  The defendant was not a resident of this apartment complex.  (Id. at 21.)  Because Agent Gazerro never saw the camera or used it, he was not sure if it could zoom in or out or pan one way or the other.  (Id. at 45-46.)  He also did not know if it could peer into residents' apartments.  (Id.)  It appears that Mr. White's image was captured by this camera.  (Id. at 47, 55.)

## C.   Search Warrant for Defendant's Cell Phone

HSI Special Agent Bennie Bryant, Jr. applied for a warrant to search Mr. White's cell phone on June 28, 2022.  (Tr. 40; see also Case No. 4:22-MC-00044-WEJ, App. & Aff. for S. Warrant [1], at 1.)[9]  The undersigned issued that search warrant the same day.  (See Case No. 4:22-MC-00044-WEJ, S. Warrant [1-1], at 1-5.)[10]

_____

[9] Defendant filed a copy of the Application and Affidavit for Search Warrant [196-1] and the Search Warrant [196-2] with his Motion.

[10] The Return for that Search Warrant is also docketed in that case number. (See Return [2], at 1-2.)

Although Agent Gazerro was not the affiant who sought the search warrant, defendant elicited some information from him about the application for it. Specifically, one of grounds supporting probable cause listed in the warrant application for Mr. White's cell phone was that Mr. Miller wanted Mr. White to travel to Rockmart to pick up drugs for him on July 15, 2021. (Tr. 48-49; see also Def.'s Ex. 1 [211-2], at 1; and Case No. 4:22-MC-00044-WEJ, App. & Aff. for S. Warrant [1], at 9-13.)[11] However, agents knew before seeking the search warrant that Mr. White did not make that trip. (Id. at 49-50.) Agents knew this because they were conducting surveillance on Mr. White. (Id. at 50.) Their surveillance showed that someone else actually went to Rockmart to pick up the package. (Id.; see also Def.'s Ex. 2 [211-3], at 1.) A separate "What's App" chat contemporaneous with the wiretap and a July 15, 2021 linesheet reflects Mr. Miller telling Mr. White that he did not have to travel to Rockmart. (Tr. 50-53; see also

_____

[11] The other grounds supporting probable cause consisted of post-Miranda statements that Mr. White made following his arrest. (Case No. 4:22-MC-00044-WEJ, App. & Aff. for S. Warrant [1], at 13-15.)

11

Def.'s Ex. 3 [211-5], at 1; Def.'s Ex. 4 [211-4], at 1-2.)  Defendant shows that the affiant did not reveal to the magistrate judge that he (White) did not go to Rockmart.

## II.   **THE INDICTMENT**

The grand jury charged the defendant with conspiring to possess with intent to distribute methamphetamine and fentanyl in violation of 21 U.S.C. §§ 846 and 841(b)(1)(A).  (See Indict. [15], Count One.)  The alleged conspiracy spanned from at least January 1, 2017 until April 26, 2022.  (Id.)

## III.   **ANALYSIS**

### A.   **Motion to Suppress Statements [189]**

The Fifth Amendment requires courts to "exclude from evidence any incriminating statements an individual makes before being warned of his rights to remain silent and to obtain counsel."  United States v. Luna-Encinas, 603 F.3d 876, 880 (11th Cir. 2010); see also United States v. Lall, 607 F.3d 1277, 1282 (11th Cir. 2010) ("Before a suspect's uncounseled incriminating statements made during custodial interrogation may be admitted, the prosecution must show 'that the suspect made a voluntary, knowing and intelligent waiver of his privilege against self-incrimination and his right to counsel.'") (citation omitted).  The government bears the burden of showing that the defendant's in-custody statements were

obtained in compliance with the dictates of <u>Miranda</u> and were otherwise voluntary, or that some exception to the <u>Miranda</u> rule applies.  <u>United States v. Chaidez-Reyes</u>, 996 F. Supp. 2d 1321, 1345 (N.D. Ga. 2014) (citing <u>Missouri v. Seibert</u>, 542 U.S. 600, 608 n.1 (2004)).

Defendant does not dispute that Agent Gazerro read his rights to him at the outset of the interview, that he himself read the Waiver of Rights form and signed it (indicating a waiver of his <u>Miranda</u> rights at that time), or that he told Agent Gazerro that he would talk to him.  Rather, defendant contends that his waiver was not knowing or voluntary, and his statements are therefore inadmissible, for three reasons:  (1) he was subjected to an intimidating show of force (i.e., numerous officers in tactical gear and some with rifles were present on his property); (2) he was told that he "had to talk;" and (3) the Government has not shown that he was not under the influence of drugs when he agreed to talk.  (Def.'s Br. [217], at 7.)

When a defendant waives his <u>Miranda</u> rights, such waiver must be "voluntary, knowing, and intelligent."  <u>United States v. Barbour</u>, 70 F.3d 580, 585 (11th Cir. 1995) (citing <u>Moran v. Burbine</u>, 475 U.S. 412, 421 (1986)).  A court looks at the totality of the circumstances when evaluating voluntariness, and the question ultimately is whether the defendant's statement "was the product of an

13

essentially free and unconstrained choice." <u>Hubbard v. Haley</u>, 317 F.3d 1245, 1252 (11th Cir. 2003) (internal quotation marks omitted).  Among the factors a court should consider "are the defendant's intelligence, the length of his detention, the nature of the interrogation, the use of any physical force against him, or the use of any promises or inducements by police." <u>Id.</u> at 1253.  "Those cases where courts have found confessions to be involuntary have contained a substantial element of coercive police conduct." <u>United States v. Patterson</u>, No. 1:06-CR-500-1-TWT, 2007 WL 2331080, at *4 (N.D. Ga. Aug. 10, 2007) (internal quotation marks omitted).  "Sufficiently coercive conduct normally involves subjecting the accused to an exhaustingly long interrogation, the application of physical force or the threat to do so, or the making of a promise that induces a confession." <u>United States v. Thompson</u>, 422 F.3d 1285, 1295-96 (11th Cir. 2005) (internal quotation marks omitted).

As for defendant's first argument, the evidence shows that there was no overwhelming show of force here which intimidated the defendant into agreeing to an interview.  Although 15-20 officers in numerous marked and unmarked cars were on the scene (some of whom had rifles and were dressed in tactical gear), only six or seven went into his residence with guns drawn.  There was no forced entry.

Once defendant was arrested, those guns were put away and not brandished again. Only three officers or agents were with defendant inside his home when they requested that he waive his <u>Miranda</u> rights; all other officers were outside.

"While [Mr. White] may have subjectively felt scared or intimidated by agents when he waived his rights and confessed, this does not constitute grounds for suppressing his statements." <u>United States v. Robinson</u>, No. 1:07-CR-0138-BBM-CCH, 2007 WL 9676863, at *4 (N.D. Ga. Nov. 19, 2007), <u>R. & R. adopted</u>, 2008 WL 11383732 (N.D. Ga. Feb. 22, 2008). The fact that officers entered the home and numerous officers were on the scene is immaterial. <u>See United States v. Dixon</u>, No. 3:20-CR-00003-TCB-RGV, 2021 WL 2327063, at *13 (N.D. Ga. Apr. 15, 2021) (rejecting motion to suppress statements despite defendant's claim that the circumstances of his interview were coercive because his home had been raided by at least 12 law enforcement officers early in the morning, he was not allowed to re-enter the home, the perimeter was surrounded by marked police cars with lights on, and he was interviewed by two agents and another law enforcement officer was nearby, such that he was outnumbered), <u>R. & R. adopted</u>, 2021 WL 1976679 (N.D. Ga. May 18, 2021).

The question is whether officers intimidated the defendant into signing the waiver and agreeing to talk. See United States v. Vega-Gutierrez, No. 1:15-CR-178-RWS-LTW-2, 2019 WL 446227, at *1 (N.D. Ga. Feb. 5, 2019) ("Although there was an initial show of force by law enforcement officers entering and securing Defendant's residence, the circumstances under which the interview of Defendant took place did not involve the same show of force."). There is no evidence of intimidation or coercion here. Mr. White was not threatened; no one pointed a weapon at him; and no one put their hands on him or used abusive language with him.[12] He asked to come inside, and the interview only lasted 27 minutes. On these facts, there is no basis to assert intimidation or coercion. See United States v. Vanbrackle, 397 F. App'x 557, 562-63 (11th Cir. 2010) (per curiam) ("While approximately eight law enforcement officers participated in the execution of the

_____

[12] Although Mr. White was handcuffed the entire time, use of handcuffs does not establish coercion. Shriner v. Wainwright, 715 F.2d 1452, 1456 (11th Cir. 1983); see also United States v. Crawford, No. 1:18-CR-318-MLB-JKL-2, 2019 WL 7559737, at *4 (N.D. Ga. Sept. 24, 2019) (finding that being handcuffed and restrained by a seatbelt falls far short of the type of physical duress necessary to establish coercion), R & R adopted, 2019 WL 5800271, at *3 (N.D. Ga. Nov. 7, 2019) ("As the Magistrate Judge correctly found, the handcuffs and seatbelt do not, on their own, render a confession involuntary.").

16

search warrant, some of whom had their guns drawn upon entry, neither Blackwell nor Witrick drew their guns during the interview, and no one stood guard over Vanbrackle."); see also United States v. Foster, No. 1:19-CR-00308-AT-RGV, 2022 WL 4359082, at *14 (N.D. Ga. July 27, 2022) (rejecting defendant's motion to suppress statements when he was not threatened, coerced, deceived, or injured, but merely claimed that he was scared and intimidated by the agents who made entry into the home; the court held that the mere execution of a warrant by law enforcement officers is a woefully inadequate basis for suppression in the absence of any threats, use of force, improper inducements, deception, or any other conduct by law enforcement agents to coerce), R. & R. adopted, 2022 WL 4361744 (N.D. Ga. Sept. 19, 2022).

Defendant also contends that his statements should be suppressed because he was told that he "had to talk." However, this statement had no bearing on defendant's willingness to engage in the interview. His willingness to engage with agents voluntarily is shown through the timeline of the interview. Before Ms. Rodriguez told Mr. White that he "had to talk," he had already verbally agreed to speak with the officers and had willingly signed a Waiver of Rights form. Before Ms. Rodriguez's statement, defendant had already divulged pertinent information

17

such as Mr. Miller's name, their relationship, and his own drug use. Because defendant began to engage in the interview before Ms. Rodriguez made her statement, the totality of the circumstances reflects that her statement did not play any part in coercing him into speaking. See United States v. Zhong Liang Li, No. 1:10-CR-31-TCB-CCH-3, 2010 WL 3881368, at *5 (N.D. Ga. Sept. 10, 2010) ("the fact that Defendant was told, after waiving his Miranda rights and during the course of his interview, that he should cooperate with the agents, or that it would be good for him to do so, does not make Defendant's earlier waiver involuntary."), R. & R. adopted, 2010 WL 3857637 (N.D. Ga. Sept. 28, 2010).

With regard to defendant's third argument, while Mr. White is a drug user, there is no evidence that he was under the influence of drugs when he agreed to talk. Indeed, Agent Gazerro testified at length about his impressions of defendant's sobriety. A review of the interview recording and the Miranda form shows that the waiver was made with full awareness.[13] During the interview, the defendant never

_____

[13] "A signed Miranda waiver is usually strong evidence that the defendant waived his rights." United States v. Bernal-Benitez, 594 F.3d 1303, 1319 (11th Cir. 2010).

expressed a misunderstanding regarding his rights or asked for counsel.  At no point in the interview did Mr. White appear confused or under the influence.  He was aware of the consequences of his statements, which is shown in his willingness to answer specific questions and not answer others.  His answers were logical in relation to the questions, and he did not claim to be high.

In sum, there is nothing to suggest that defendant's waiver of rights was anything less than voluntary, knowing, and intelligent.  Law enforcement officers complied with the requirements of Miranda v. Arizona, 384 U.S. 436 (1966).  And for the same reasons the undersigned reports that the wavier was voluntary, so too were defendant's subsequent statements to the agents.  See United States v. Jones, 32 F.3d 1512, 1516 (11th Cir. 1994) ("We first decide whether the law enforcement officers complied with the requirements of Miranda v. Arizona; if so, we then determine if the confession was voluntary.") (citation omitted)).  Here again, there is no evidence to suggest that the defendant's statements were involuntary.

The undersigned thus reports that the Government has shown under the totality of the circumstances that Mr. White voluntarily waived his rights and voluntarily made statements that were the product of a free and deliberate choice, made in the absence of intimidation, coercion, and deception.  Accordingly,

19

defendant's Motion to Suppress Statements [189] should be **DENIED**.

**B.     Motion to Suppress Camera Surveillance [191]**

In this Motion, Mr. White challenges the pole camera that faced the front of Mr. Miller's residence (which never captured his image) and the camera in the interior hallway of an apartment complex at Atlantic Station (which captured his image).[14]  A defendant challenging the legality of a search bears the initial burden of showing that he has standing by proving he possessed an objectively reasonable expectation of privacy in the area searched or items seized.  See Rehberg v. Paulk, 611 F.3d 828, 842 (11th Cir. 2010) (citations omitted).  To establish a reasonable expectation of privacy, the defendant must manifest a subjective expectation of privacy in the items searched or seized, and society must be prepared to recognize that expectation as legitimate or objectively reasonable.  Id. (citation omitted).  In other words, a defendant must establish both a subjective and an objective

---

[14] Defendant's Motion presents a challenge based on the Fourth Amendment, which provides in relevant part as follows:  "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]"  U.S. Const. amend. IV.

20

expectation of privacy.  United States v. Segura-Baltazar, 448 F.3d 1281, 1286 (11th Cir. 2006) (citation omitted).

The law is clear that someone like Mr. White who did not reside at either 5 Quail Court in Cartersville or the Atlantic Station apartment complex lacks standing to make a Fourth Amendment challenge to the cameras the Government installed at these locations.  See United States v. Campbell, 434 F. App'x 805, 810 (11th Cir. 2011) (per curiam) (defendant who neither lived in nor leased the house lacked standing to challenge its search); United States v. Brazel, 102 F.3d 1120, 1148 (11th Cir. 1997) (defendant who offered no evidence "to show that he was the tenant or had an unrestricted right of occupancy or control in the apartment at the time of the search," and where the evidence showed that the defendant was not the lessee and was not paying rent, lacked standing to challenge its search); and United States v. Baron-Mantilla, 743 F.2d 868, 870 (11th Cir. 1984) (defendant who neither owned nor rented the searched apartment, did not have the telephone number for the apartment listed in his name, and who did not present any witness

testimony to corroborate his claim that he lived in the apartment, lacked standing to challenge its search).[15]

Because defendant has failed to demonstrate that he had any expectation of privacy that society would be willing to accept as reasonable in what happened in the open, public areas in front of a home or in the hallway of an apartment complex, his Motion to Suppress video surveillance evidence from either of these cameras should be **DENIED**.  See United States v. Flores, No. 1:19-CR-389-LMM-CCB-15, 2022 WL 19828971, at *17 (N.D. Ga. Nov. 17, 2022), R. & R. adopted in part, rejected in part, 2023 WL 3095566, at *2 (N.D. Ga. Apr. 26, 2023) (overruling

_____

[15] Defendant also makes a challenge to the cameras based on Carpenter v. United States, 138 S. Ct. 2206, 2020-21 (2018) (acquisition of historical cell site records amounts to a search within the meaning of the Fourth Amendment and that, generally speaking, law enforcement must obtain a warrant supported by probable cause before acquiring such records.)  The Supreme Court made clear that its decision was intended to be a "narrow one" that should not "call into question conventional surveillance techniques and tools, such as security cameras."  Id. at 2220.  This Court has rejected application of Carpenter to cameras such as those challenged here.  See United States v. Fanning, No. 1:18-CR-362-AT-CMS, 2019 WL 6462830, at *4 (N.D. Ga. May 28, 2019), R. & R. adopted, 2019 WL 3812423 (N.D. Ga. Aug. 13, 2019).  The Court does so here as well.

defendant's objections to magistrate judge's recommendation that his motion to suppress pole-camera evidence be denied).

**B.    Motion to Suppress Evidence Seized from any Warrantless Search of Defendant's Residence or other Property, Including Cell Phone [196]**

This Motion focuses on (1) the seizure of defendant's cell phone after his arrest and custodial interrogation and (2) the subsequent application for a warrant to search his cell phone.  The Court analyzes these issues separately below.

### 1.   Seizure of Defendant's Cell Phone

The Fourth Amendment protects the right of persons to be free from unreasonable searches and seizures.  U.S. Const. amend. IV.  A "seizure" of personal property occurs for purposes of the Fourth Amendment if the police meaningfully interfere with an individual's possessory interests in that property. See United States v. Jacobsen, 466 U.S. 109, 113 (1984).  The burden of proof as to the reasonableness of a search or seizure rests with the prosecution.  United States v. Freire, 710 F.2d 1515, 1519 (11th Cir. 1983).  Given there was no search warrant here, the Government must demonstrate that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby

23

rendering it reasonable under the Fourth Amendment.  <u>Vale v. Louisiana</u>, 399 U.S. 30, 34 (1969).

Although defendant initially asserted that the Government had offered no exception to the warrant requirement that allowed Agent Gazerro to seize his cell phone (Def.'s Br. [217], at 15), that was inaccurate.  The Government presented testimony from Agent Gazerro that he seized the cell phone in plain view.[16] Officers may seize evidence that is in plain view despite the failure to obtain a search warrant if two elements are met:  "(1) an officer is lawfully located in the place from which the seized object could be plainly viewed and must have a lawful right of access to the object itself; and, (2) the incriminating character of the item is immediately apparent."  <u>United States v. Smith</u>, 459 F.3d 1276, 1290 (11th Cir. 2006).

_____

[16] The defendant argues in his Reply that the Government offered no evidence to corroborate Agent Gazerro's claim that the seized cell phone was in plain view.  (Def.'s Reply [231], at 4.)  The Government did not need corroboration.  Agent Gazerro's testimony was credible and nothing contradicted it.  The fact that the video of the defendant's interview did not capture an image of his cell phone sitting on the coffee table is irrelevant.

Here, agents executed a lawfully obtained arrest warrant.  Agents did not conduct a search of the defendant's residence as they were not authorized to do so. However, when asked where he wanted to be interviewed, the defendant elected to re-enter his home with agents for the interview.  While conducting the interview, Agent Gazerro observed the defendant's cell phone in plain view on the coffee table.  Thus the first Smith requirement was met.[17]

As for the second Smith requirement, the "immediately apparent" language does not require a law enforcement officer to "'know' that certain items are contraband or evidence of a crime."  Texas v. Brown, 460 U.S. 730, 741 (1983). Indeed, "[t]he seizure of property in plain view involves no invasion of privacy and is presumptively reasonable, assuming that there is probable cause to associate the

---

[17] Defendant also argues for the first time the case of United States v. Mejia-Velazquez, No. 1:21-CR-00137-SDG, 2013 WL 120621 (N.D. Ga. Jan. 6, 2023), to support his claim that the plain view exception does not apply.  (Def.'s Reply [231], at 3.)  A party cannot make a new argument in a reply brief.  See Herring v. Sec'y, Dep't of Corr., 397 F.3d 1338, 1342 (11th Cir. 2005) ("As we repeatedly have admonished, arguments raised for the first time in a reply brief are not properly before a reviewing court.") (internal quotation marks and citation omitted). In any event, Mejia-Velazquez is inapposite because the agent there was not lawfully in the place from which the seized object could be plainly viewed.  2013 WL 120621, at *7-8.

property with criminal activity."  Payton v. New York, 445 U.S. 573, 587 (1980).

With regard to probable cause, the Supreme Court holds as follows:

> [P]robable cause is a flexible, common-sense standard.  It merely requires that the facts available to the officer would "warrant a man of reasonable caution in the belief," Carroll v. United States, 267 U.S. 132, 162, 45 S. Ct. 280, 288, 69 L.Ed. 543 (1925), that certain items may be contraband or stolen property or useful as evidence of a crime; it does not demand any showing that such a belief be correct or more likely true than false.  A "practical, nontechnical" probability that incriminating evidence is involved is all that is required.  Brinegar v. United States, 338 U.S. 160, 176, 69 S. Ct. 1302, 1311, 93 L.Ed. 1879 (1949).

Brown, 460 U.S. at 741-42.  Additionally, "[p]robable cause does not require the same type of specific evidence of each element of the offense as would be needed to support a conviction."  Adams v. Williams, 407 U.S. 143, 149 (1972).  In determining whether probable cause exists, the Court "'deal[s] with probabilities . . . [which] are the factual and practical considerations of everyday life on which reasonable and prudent men, not legal technicians, act.'" Illinois v. Gates, 462 U.S. 213, 231 (1983) (quoting Brinegar, 338 U.S. at 175).

Given these standards, the undersigned reports that Agent Gazerro knew that the defendant used his cell phone in order to conduct drug transactions and that evidence of those transaction could be located on that cell phone.  Although the cell phone he seized was not the cell phone captured on the wiretaps, Agent

26

Gazerro's training and experience led him to conclude that evidence of drug transactions could be on this cell phone, especially given the wiretaps and the on-going nature of this conspiracy.

This case is similar to <u>United States v. Rodriguez-Alejandro</u>, 664 F. Supp. 2d 1320 (N.D. Ga. 2009).  There, DEA agents were lawfully present in the defendant's bedroom as part of a drug trafficking investigation, and they observed four cell phones. <u>Id.</u> at 1345.  The agents neither physically manipulated the phones nor attempted to call them; they merely "immediately recognized the incriminating nature of the cell phones."  <u>Id.</u>  Even though there were two individuals in the defendant's bedroom and the defendant maintained that the agents could not have known which cell phones belonged to which individual without further examination, Judge Thrash determined that the cell phones were lawfully seized pursuant to the plain view doctrine.  <u>Id.</u> at 1345-46.  In the context of that drug trafficking wiretap investigation, Judge Thrash reasoned that the agents had probable cause to seize the cell phones regardless as to whom they belonged: "Although the agents could not immediately ascertain whether all four cell phones belonged to [the defendant], the phrase 'immediately apparent' does not imply that an unduly high degree of certainty as to the incriminatory character of evidence is

necessary for an application of the 'plain view' doctrine." <u>Id.</u> at 1346 (cleaned up) (quoting <u>Brown</u>, 460 U.S. at 741).   In other words, Judge Thrash concluded that cell phones, which are often instrumentalities of the drug trade, were inherently incriminatory and justifiably seized in that specific context.   <u>Id.</u> at 1345 (citing <u>United States v. Santillan</u>, 571 F. Supp. 2d 1093, 1100-01 (D. Ariz. 2008) (finding the seizure of a cell phone justified under the "plain view" doctrine where "officers had good reason to believe the phone was being used in the furtherance of a drug-trafficking crime" and citing authority for the proposition that cell phones "in drug-trafficking investigations may come within the plain view exception to the warrant requirement as items akin to contraband, in that they are often tools of the drug-trafficking trade.")).[18]

---

[18] <u>See also</u> <u>United States v. Hearst</u>, No. 1:18-CR-054-RWS-AJB, 2022 WL 16832834, at *19-20 (N.D. Ga. Mar. 10, 2022), <u>R. & R. adopted</u>, 2022 WL 8163946 (N.D. Ga. Oct. 14, 2022) (rejecting argument that the plain view doctrine was inapplicable because it was not immediately apparent that the cell phone was the same one the defendant possessed the previous week and there was nothing inherently suspicious about the cell phone to justify its warrantless seizure); <u>United States v. Jaimez</u>, 15 F. Supp. 3d 1338, 1343 (N.D. Ga. 2013) (upholding plain view seizure of cell phones and finding "that the incriminating nature of the cellular

In sum, Agent Gazerro was in a place he was lawfully authorized to be, and the incriminating nature of the evidence (i.e., the cell phone) was readily apparent. Therefore, defendant's Motion to Suppress the cell phone as illegally seized should be denied.

### 2.    Search of Defendant's Cell Phone

Regarding the search of his cell phone, defendant contends that (1) agents waited too long to apply for the warrant; (2) the contents of the search should be suppressed because there was no probable cause for issuance of the warrant due to the affiant misleading the Court; and (3) the search of the cell phone was unlawful because it occurred after the deadline set in the warrant.  The Court addresses these contentions separately below.

————————————————

phones was immediately apparent" in a case involving wiretaps, indicating use of phones, and where several phones were located in one place, "suggesting in this context that the phones were used for drug sales"); and United States v. Lisbon, 835 F. Supp. 2d 1329, 1363 (N.D. Ga. 2011) (upholding plain view seizure of cell phones because "the Eleventh Circuit and numerous other federal appellate courts recognize that cell phones are 'a known tool of the drug trade,'" and finding that this reasoning was persuasive in that case where the "drug conspirators were shown to utilize cell phones to communicate with one another") (citations omitted).

29

### a) <u>Delay in Applying for the Search Warrant</u>

Although it is lawful to seize items like cell phones based on probable cause to believe that they contain contraband, a seizure lawful at its inception can nevertheless become unlawful if its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on unreasonable seizures.  <u>United States v. Jacobsen</u>, 466 U.S. 109, 121–22 (1984).  A temporary warrantless seizure supported by probable cause is reasonable as long as "the police diligently obtained a warrant in a reasonable period of time."  <u>Illinois v. McArthur</u>, 531 U.S. 326, 334 (2001).

The delay here between the seizure of Mr. White's cell phone and application for a warrant to search it was 33 days.  Defendant argues that this was too long, citing <u>United States v. Mitchell</u>, 565 F.3d 1347 (11th Cir. 2009) (21-day delay in seeking search warrant was unreasonable).  The Government disagrees.

In <u>United States v. Laist</u>, 702 F.3d 608 (11th Cir. 2012), the court made clear that there is no bright-line rule concerning how long of a delay is unreasonable.  To the contrary, <u>Laist</u> emphasizes the very case-specific nature of this analysis and identifies a number of factors that courts should consider in balancing the interests of the government and the defendant.  Those factors include:  (1) the significance

of the interference with the defendant's possessory interest, (2) the duration of the delay, (3) whether the defendant consented to the seizure, (4) the government's legitimate interest in holding the property as evidence, and (5) the government's diligence in pursuing a search warrant. Id. at 613-14. The government's diligence, in turn, can be measured by a number of considerations, which may include: (1) the nature and complexity of the investigation, (2) whether "overriding circumstances arose, necessitating the diversion of law enforcement personnel to another case," and (3) the quality of the warrant application and the amount of time it should take to prepare it. Id. at 614 (internal citations omitted). These factors "are by no means exhaustive." Id.

Applying these factors here shows that the 33-day delay was not unreasonable. Although there was significant interference with the defendant's possessory interest through seizure of his cell phone, he never sought its return. "The failure to make a request for return of the cellular telephone[] during the period of delay undermines Defendant's claim that his Fourth Amendment rights were impacted." United States v. Brantley, No. 1:17-CR-77-WSD, 2017 WL 5988833, at *3 (N.D. Ga. Dec. 4, 2017); see also Thomas v. United States, 775 F. App'x 477, 490 (11th Cir. 2019) (per curiam) (considering fact that defendant never

requested return of seized desktop during the 33 days it took to secure a search warrant as a factor in diminishing his possessory interest in the desktop).

Additionally, the Government had a legitimate interest in holding the defendant's cell phone as evidence, expecting it to contain texts, pictures, location tags, or call logs relating to his alleged trafficking of drugs.  See United States v. Lawson, No. 3:21-CR-00006-TCB-RGV, 2022 WL 1134721, at *16 (N.D. Ga. Feb. 2, 2022), R. & R. adopted sub nom. United States v. Middleton, 595 F. Supp. 3d 1277 (N.D. Ga. 2022) (fourth Laist factor strongly weighed in the government's favor because it had a legitimate interest in holding the property as evidence).

Finally, the Court takes note of the nature and complexity of the investigation which led to the instant Indictment.  As the Government correctly points out, the alleged conspiracy here spanned from at least January 1, 2017 until April 26, 2022. (See Indict. [15].)  On May 24, 2022, eight separate defendants were indicted on ten separate counts, which led to eight separate arrest warrants and ultimate arrests. (See docket entries [25]-[32].)  In the month that followed, seven of the defendants were brought in for initial appearances, detention hearings, and arraignments.  (See docket entries [33], [37], [39], [46], [61], [67], [73].)

Given the complexity of the case, the number of defendants who were involved, and the speed at which arrests were made, it was not unreasonable for there to be a 33-day delay between the seizure of the defendant's cell phone and issuance of the search warrant. "This is a far cry from delaying the warrant process because [the agents in this investigation] 'didn't see any urgency.'" United States v. Vedrine, No. 20-13259, 2022 WL 17259152, at *4 (11th Cir. Nov. 29, 2022) (citing Mitchell, 565 F.3d at 1351). In similar cases involving complex matters, delays like the 33-day delay here were found to be reasonable. See Laist, 702 F.3d at 616 (25-day delay in obtaining a search warrant for a computer was reasonable); Thomas, 775 F. App'x at 489 (33-day delay in obtaining a search warrant for a computer was reasonable); United States v. Atkins, 702 F. App'x 890, 896 (11th Cir. 2017) (per curiam) (30-day delay in obtaining a warrant to search a cell phone was reasonable); and United States v. Vallimont, 378 F. App'x 972, 976 (11th Cir. 2010) (per curiam) (45-day delay in obtaining a warrant to search a computer was reasonable). Accordingly, the undersigned reports that the 33-day delay here between the seizure of Mr. White's cell phone and the Government's application for, and receipt of, a warrant authorizing its search was reasonable. Therefore, the

defendant's Motion to Suppress any evidence found during the search of his cell phone because of the delay in seeking the warrant should be denied.

### b)   Probable Cause and Misleading the Court

In this part of defendant's Motion, he argues that the search warrant for his cell phone was not supported by probable cause because the affiant misled the court about two facts.  In contradiction of what was stated in the warrant application: (1) defendant did not actually make the trip to Rockmart to pick up drugs for Mr. Miller; and (2) defendant's cell phone was not seized pursuant to a search warrant.

As the Court noted at the hearing (Tr. 51-52, 57-59), a defendant typically seeks to make an argument like this under the auspices of Franks v. Delaware, 438 U.S. 154 (1978).  "Entitlement to a Franks hearing requires a defendant to make a 'substantial preliminary showing' establishing (1) the affiant deliberately or recklessly included a false statement, or failed to include material information, in the warrant affidavit; and (2) the allegedly false statement or omission was necessary to the finding of probable cause."  United States v. Gray, 544 F. App'x 870, 882 (11th Cir. 2013) (per curiam) (citing Franks, 438 U.S. at 155-56).  "The defendant's attack must be 'more than conclusory,'" and "'[a]llegations of negligence or innocent mistake are insufficient.'"  Id. (quoting Franks, 438 U.S. at

34

171).  "Allegations of deliberate falsehood or reckless disregard for the truth 'must be accompanied by an offer of proof.'"  United States v. Rousseau, 628 F. App'x 1022, 1023 (11th Cir. 2015) (per curiam) (quoting United States v. Arbolaez, 450 F.3d 1283, 1294 (11th Cir. 2006)).  Moreover, "'even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause.'"  Gray, 544 F. App'x at 882 (quoting Madiwale v. Savaiko, 117 F.3d 1321, 1327 (11th Cir. 1997)).  "[T]he defendant must show that, if the misrepresentations were removed from, or the omitted facts were included in, the warrant affidavit, then probable cause would be lacking."  Rousseau, 628 F. App'x at 1023.  "If the warrant would still support probable cause, then no Franks hearing is necessary.  Id.

Defendant here did not file a Motion seeking a Franks hearing.  Nevertheless, the Court allowed defendant to proceed at the hearing.[19]  Had defendant filed a Franks motion, it would have been denied for the same reasons the Court

_____

[19] Defendant complains that the affiant for the search warrant affidavit did not testify at the hearing.  (Def.'s Reply Br. [231], at 6.)  That is not surprising since the Government did not know, given defendant's failure to file a Franks motion, that the affiant's testimony might be relevant.

recommends its denial now after the hearing.  Even assuming that both errors in the search warrant application were deliberately or recklessly false (and not simply the result of negligence or an innocent mistake), neither was necessary to the finding of probable cause.

Specifically, it does not matter that Mr. White did not make the trip to Rockmart to pick up drugs for Mr. Miller.  The application shows that he was part of the drug conspiracy given his willingness to make the trip to Rockmart in the first place.  It also does not matter that the application erroneously claimed that the defendant's cell phone had been seized pursuant to a search warrant.  That fact only changes the manner in which the cell phone was obtained, not the basis to believe that it contained evidence of a crime.

The twenty-page affidavit submitted by Special Agent Bryant contains extensive probable cause to support the Court's decision to issue the warrant.  This includes both evidence from the wiretap investigation as well as admissions made by the defendant during his interview.  These facts present "substantial evidence in the record supporting the [Court's] decision to issue the warrant."  Massachusetts v. Upton, 466 U.S. 727, 728 (1984).  Based on the totality of the evidence presented in the affidavit, there was more than sufficient basis for this Court to determine that

36

there was a fair probability that a search of the defendant's cell phone would produce evidence of illegal activity. Therefore, defendant's Motion to Suppress the evidence obtained from a search of his cell phone should be denied.[20]

### c)   <u>Delay in Executing the Search Warrant</u>

Defendant shows that the deadline for Special Agent Bryant to execute the search warrant issued by this Court was July 12, 2022. (Search Warrant [217-2], at 1.) According to the Return for that Search Warrant, certified by Special Agent Bryant on July 7, 2022, a "forensic extraction [was] saved to government evidence drive." (<u>Id.</u> at 2.) A Department of Homeland Security form attached to defendant's Motion shows that "[t]he S[earch] W[arrant] expired on July 12, 2022, but SA Bryant started the extraction process during the time frame granted on the SW." (HSI Doc. [217-1], at 1.) HSI eventually was able to open the defendant's cell phone when its software obtained his six-digit passcode. (<u>Id.</u> at 3.) The HSI

---

[20] Even if the search warrant at issue was found to be invalid, suppression of the evidence seized from the cell phone would not be required because the officers executing the warrants reasonably relied in good faith on the validity of the warrant. <u>See</u> <u>United States v. Leon</u>, 468 U.S. 897, 919-21 (1984).

document shows that agency examined the defendant's cell phone on August 23, 2022.  (Id.)

Defendant argues that any evidence obtained by this examination (which appears to have occurred over a month after the deadline in the search warrant had expired) should be suppressed.  The Government responds that when Special Agent Bryant attempted to access the locked device, he began execution of the warrant. The fact that accessing the locked device required forensic tools and an extensive amount of time is not dispositive.  Instead, the Government urges the Court to look at when Special Agent Bryant first attempted to access the device, July 7, 2022, and find that he complied with the Court's directives.  Neither party cites any case law supporting their arguments.

The undersigned notes that the "Fourth Amendment does not specify that search warrants contain expiration dates." United States v. Gerber, 994 F.2d 1556, 1559 (11th Cir. 1993) (citations omitted).   Indeed, the Fourth Amendment "contains no requirements about when the search or seizure is to occur or the duration."   United States v. Hodges, No. 1:09-CR-562-CAP-LTW, 2010 WL 4639238, at *3 (N.D. Ga. Sept. 15, 2010) (citation and internal marks omitted), R. & R. adopted, 2010 WL 4638872 (N.D. Ga. Nov. 8, 2010).  Nevertheless, Rule

41(e)(2)(A)(i) of the Federal Rules of Criminal Procedure provides that warrants must command officers to "execute the warrant within a specified time no longer than 14 days." However, "[v]iolations of Rule 41 do not necessarily rise to the level of constitutional violations." United States v. Harvey, No. 1:15-CR-00053-TWT-RGV-1, 2015 WL 9685908, at *14 (N.D. Ga. Nov. 30, 2015), R. & R. adopted, 2016 WL 109984 (N.D. Ga. Jan. 8, 2016) (quotation marks omitted).

When analyzing Rule 41 violations pertaining to search warrants, the Eleventh Circuit holds as follows:

> Unless a clear constitutional violation occurs, noncompliance with Rule 41 requires suppression of evidence only where (1) there was prejudice in the sense that the search might not have occurred or would not have been so abrasive if the rule had been followed, or (2) there is evidence of an intentional and deliberate disregard of a provision in the Rule.

United States v. Brown, 569 F. App'x 759, 762 (11th Cir. 2014) (per curiam) (citation, internal quotation marks, and emphasis omitted); see also United States v. Loyd, 721 F.2d 331, 333 (11th Cir. 1983) (stating same two-part test).

Here, Mr. White has not demonstrated that a constitutional violation occurred. In addition, both of the factors cited in Brown and Loyd weigh against suppression. Mr. White does not argue nor has he demonstrated that he has been prejudiced by the timing of the search. In addition, there is no evidence that law

39

enforcement intentionally and deliberately disregarded the deadline for executing the warrant.  To the contrary, the record suggests that Agent Bryant tried to open the locked cell phone, was unsuccessful, and had to send it to the HSI lab for experts to connect the cell phone to software which cracked its six-digit code so that agents could access the information the warrant allowed them to search.

Therefore, the undersigned reports that there is no basis to suppress the search of the defendant's cell phone that occurred after the deadline in the search warrant.  See United States v. Mobely, No. 1:16-CR-145-TWT-JKL-6, 2017 WL 10574358, at *11 (N.D. Ga. Oct. 26, 2017) ("In sum, Mobely has not shown any prejudice, there is no evidence that the government acted in bad faith, and the delay did not diminish probable cause; therefore, suppression is not warranted under the circumstances of this case."), R. & R. adopted sub nom. United States v. Mobley, 2018 WL 5077755 (N.D. Ga. Oct. 18, 2018); Harvey, 2015 WL 9685908, at *14-15 (rejecting challenge to warrant executed after deadline in search warrant where defendant did not allege any prejudice, delay did not diminish probable cause, and there was no evidence that the government intentionally and deliberately disregarded the warrant's expiration date); and United States v. Filippi, No. 5:15-CR-133 (BKS), 2015 WL 5789846, at *7 (N.D.N.Y. Sept. 9, 2015) (holding

40

government's one-month delay in searching the phone after expiration of the warrant did not warrant suppression of the evidence because "there [was] no evidence that the government acting in bad faith or with deliberate disregard of the search warrant deadline," the defendant did "not allege any prejudice," and the delay "did not diminish the probable cause for the search of defendant's phone.").

## IV.   CONCLUSION

For the reasons stated above, the undersigned **RECOMMENDS** as follows:

that Defendant's Motion to Suppress Statements [189] be **DENIED**;

that Defendant's Motion to Suppress Pole Camera Surveillance [191] be **DENIED**; and

that Defendant's Motion to Suppress Evidence Seized from any Warrantless Search of Defendant's Residence or other Property, Including Cell Phone [196] be **DENIED**.

**SO RECOMMENDED**, this 25th day of August, 2023.

_____
WALTER E. JOHNSON
UNITED STATES MAGISTRATE JUDGE

41